UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No.: 5:11 CR 184 |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | JUDGE SOLOMON OLIVER, JR. |
| | ) | |
| LAMONTA R. MCCOY, | ) | |
| | ) | |
| Defendant | ) | <u>ORDER</u> |

Currently pending in the above-captioned case is Defendant Lamonta R. McCoy's ("Defendant" or "McCoy") Motion to Suppress (ECF No. 16). For the following reasons, the court grants Defendant's Motion.

## I. FACTS AND PROCEDURAL HISTORY

The court held a suppression hearing on August 3, 2011, at 10:00 a.m. At the hearing, the court heard testimony from only one witness, FBI Special Agent Doug Porrini ("Porrini"). Mr. Porrini testified that he had been a Special Agent for approximately nine years, and that at the time of the arrest at issue in this case, he was assigned with the Summit County Drug Unit. On April 1, 2011, officers from the Summit County Drug Unit, the Akron Police Department, and the FBI conducted a controlled buy of approximately nine ounces of cocaine from Dennis L. Buchanan, currently a Co-Defendant in this case. The authorities utilized a Confidential Human Source ("CHS"), who was provided with $9,500 in U.S. currency that was marked before the buy. The CHS had participated in controlled buys from Buchanan previously. In fact, the CHS bought between

eight and nine kilograms of cocaine from Buchanan for approximately a year and a half leading up to April 1, 2011.

The CHS wore a video recording device and a transmitter during the April 1, 2011 drug transaction. At approximately 11:05 a.m., on April 1, 2001, the CHS placed a recorded telephone call to Buchanan. Buchanan instructed the CHS to come to his restaurant, Wing 18, located in Akron, Ohio. At approximately 1:30 p.m., the CHS arrived at Wing 18, stepped inside the restaurant, and subsequently came back to his vehicle to wait for Buchanan in the parking lot. Buchanan arrived within 20 minutes, and after meeting with CHS briefly at Wing 18, Buchanan and the CHS drove separately to Buchanan's residence, which is located at 721 Bellevue Ave., Akron, Ohio, and which had been under surveillance.

The CHS and Buchanan entered the residence, and the CHS took the controlled buy money into the residence with him. At approximately 2:05 p.m., the CHS left the house and drove away. Authorities stopped the CHS at a location away from Buchanan's residence and found that he was in possession of a bag of a powdered substance, which they tested and confirmed was cocaine. Of the $9,500 originally provided to him, the CHS had $1,000 left. Porrini testified that he ordered the investigators waiting outside of Buchanan's residence to continue surveillance of the residence and to stop anyone who attempted to leave the residence.

At 2:10 p.m., investigators observed a man, who was later identified as McCoy, leave Buchanan's residence, enter a vehicle, and drive away. Porrini testified that the officers surveilling the scene had not observed McCoy enter the premises. Further, McCoy was not overheard through the CHS's recording device or observed through the video recording. Detective Boss and Detective Niada from the Akron Police Department followed the vehicle and initiated a stop about one mile

from Buchanan's residence. Once stopped, the officers ordered Defendant out of the vehicle and placed him in handcuffs. Porrini testified that McCoy was stopped pursuant to a traffic stop, and that the arrest paperwork indicated that it was a traffic stop, but that there was no traffic violation. The officers found $8,550.00 in United States currency; $7,000 matched the controlled buy money. No drugs were found in the vehicle or on McCoy's person. Buchanan and two women left Buchanan's residence after McCoy. Porrini testified that the police did not arrest the two women. Both McCoy and Buchanan were arrested and charged with drug trafficking.

Following his arrest, McCoy made several statements, including that Buchanan had told him to take the money back to Wing 18 and that Buchanan was possibly going to purchase a truck. Porrini admitted that on April 1st, Buchanan was driving a truck that had a price displayed on the window as well as dealer tags. McCoy filed a Motion to Suppress on June 13, 2011. (ECF No. 16.) The Government filed its Response on June 27, 2011. (ECF No. 21.)

## II. LAW AND ANALYSIS

The Sixth Circuit has explained that "there are three types of permissible encounters between the police and citizens: '(1) the consensual encounter, which may be initiated without any objective level of suspicion; (2) the investigative detention, which, if non-consensual, must be supported by a reasonable, articulable suspicion of criminal activity; and (3) the arrest, valid only if supported by probable cause.'" *United States v. Waldon*, 206 F.3d 597, 602 (6th Cir. 2000) (quoting *United States v. Avery*, 137 F.3d 343, 352 (6th Cir.1997)). In this case, the Government does not argue that evidence was obtained pursuant to a consensual encounter and thus the court limits its analysis to whether there was probable cause to arrest McCoy, or alternatively, whether officers had reasonable, articulable suspicion to support an investigative detention. The Government further argues that even

if the seizure at issue in this case was unlawful, suppression is not warranted because the arresting officers acted in good faith and thus suppression of evidence would not have any deterrent value. (Government Resp. 5–7, ECF No. 21.) The court addresses each argument in turn.

### A. Probable Cause

The first question is whether the officers had probable cause to arrest McCoy following his departure from the Buchanan residence. If there was probable cause, then the search might have been proper as a search incident to a valid arrest, but if there was no probable cause, then the search would not be legal. *See United States v. Smith*, 549 F.3d 355, 360–61 (6th Cir. 2008). Probable cause is generally defined as "reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion." *United States v. Copeland*, 321 F.3d 582, 592 (6th Cir. 2003) (quoting *United States v. Ferguson*, 8 F.3d 385, 392 (6th Cir. 1993) (en banc)) (citation omitted); *see also United States v. Davis*, 514 F.3d 596, 607, 610 (6th Cir.2008) (noting that an arrest is valid only if based on probable cause that defendant committed a crime). In making this determination, a court should look at the facts available to the officer at the time and determine whether, based on those facts, an officer of reasonable caution would believe that a violation has occurred. *United States v. Westmoreland*, 224 F. App'x 470, 473 (6th Cir. 2007). *See also Klein v. Long*, 275 F.3d 544, 550 (6th Cir. 2001) ("Probable cause is assessed 'from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'") (quoting *Kostrzewa v. City of Troy*, 247 F.3d 633, 639 (6th Cir. 2001)) (citation omitted).

Regarding the substance of the probable cause determination, the Supreme Court has held that "a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person." *Ybarra v. Illinois*, 444 U.S. 85, 91

(1979).

The Sixth Circuit applied the *Ybarra* rule in *United States v. Davis*, 430 F.3d 345 (6th 2005), a case involving a similar fact pattern. In *Davis*, Cook County, Ill. investigators followed a suspected drug dealer, Presley, to a residential address, where Presley subsequently met with Davis. *Id.* At 349. Investigators had been tracking Presley for several months and had arrested a number of people who had been observed dealing in drugs with Presley. *Id.* The investigators on the case, however, "had had no previous encounters with Davis and did not know who Davis was." *Id.* At the scene, the officers "observed two Tide detergent boxes near the Range Rover." *Id.* After conversing inside the residence, both men left the residence and drove away separately. *Id.* The investigators notified Indiana State Troopers of their suspicion that Davis' car was carrying contraband, and once in Indiana, Davis was pulled over by State Troopers for speeding. *Id.* Soon after the stop, the Cook County investigators arrived on the scene and informed the Indiana State Troopers of their suspicion that the car was carrying drugs. *Id.* After refusing to consent to a search of the vehicle, officers informed Davis that while he could leave, he could not move the vehicle because officers were waiting for a drug-sniffing dog. *Id.* at 350. After one dog failed to alert, officers held the car longer before a second dog arrived. *Id.* After that dog alerted, Indiana police obtained a search warrant based on surveillance observations and the dog's alert. *Id.*

In addressing the legality of the initial stop, the Sixth Circuit held that it was lawful because officers had "probable cause to believe that a traffic offense ha[d] occurred." *Id.* at 352.[1] However, the court rejected the argument that investigators "also had probable cause to stop Davis because

---

[1] As noted above, Porrini testified that McCoy was not pulled over for any traffic violations, and thus this justification is ruled out.

they could properly conclude that there was a 'fair probability that contraband or evidence of a crime [would] be found' in Davis's car." *Id.* (citing *Illinois v. Gates*, 462 U.S. 213, 238, (1983)). The court found that this would impermissibly base a finding of probable cause on a person's "mere propinquity" to others independently suspected of criminal activity. *Id.* (citing *Ybarra*, 444 U.S. at 91.) The court distinguished *United States v. Padro*, 52 F.3d 120, 123 (6th Cir. 1995), wherein the facts showed that the individual in question was not only associating with a suspected criminal but had also been observed engaging in suspicious activity with him, by noting that Davis and Presley "merely spoke in a residential driveway, and the police had no information regarding the nature of the conversation." *Id.* at 352–53. A finding of probable cause on these facts would mean that "almost anyone who spoke with Presley could be constitutionally stopped and searched by the police." *Id.* at 353. The fact that Davis and Presley had been observed conversing was not enough, even though the "presence of the detergent boxes may have correctly been a source of suspicion." *Id.* at 353.

The facts of this case are similar. While the officers knew that a drug transaction had just taken place in Buchanan's house and that Buchanan was in possession of prerecorded money, the police had no prior knowledge of McCoy and did not have any surveillance of McCoy prior to him exiting the house. In the year and a half that the CHS purchased drugs from Buchanan, he never met or heard about McCoy. Porrini testified that the audiotape of the conversation between the CHS and Buchanan in Buchanan's house only had their two voices on it and nobody else's. Therefore, the first time that the police officers became aware of McCoy's existence is when he left Buchanan's house approximately five minutes after a drug transaction occurred. Moreover, McCoy was not observed to be in possession of suspicious items as he exited the residence. In sum, the Government's argument that probable cause existed on these facts rests on "mere propinquity" to a known

-6-

individual independently suspected of criminal activity. "Mere propinquity," of course, does not rise to the level of probable cause, and therefore the court rejects the argument that probable cause supported McCoy's seizure.

Significantly, when the Sixth Circuit analyzed a different case with similar facts, it undertook an analysis of whether the officers had reasonable suspicion to conduct an investigatory stop and did not even consider whether probable cause existed on the facts. In *United States v. Flores*, 571 F.3d 541 (6th Cir. 2009), police officers had been monitoring a home that they suspected to be a "stash house" for drugs for a long enough time to know what vehicles typically come and go from the home. *Id.* at 543. When the officers learned that a drug transaction was about to occur, they went to this stash house and observed an unfamiliar Jeep Grand Cherokee in the driveway. *Id.* When the officers ran the license plate, they learned that the vehicle belonged to Robert Flores, someone with whom the agents were unfamiliar. *Id.* When the Jeep left the driveway, officers followed it and eventually stopped it. Once stopped, Flores consented to a search of the vehicle, and the police discovered over $20,000 in cash. *Id.*

Flores filed a motion to suppress the evidence, challenging the initial stop of the Jeep. The district court denied it. The Sixth Circuit affirmed this denial and determined that stopping the Jeep was a lawful investigatory stop pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968). *Id.* at 545. The court never considered whether the officers could have probable cause and in fact explained that a reasonable suspicion analysis applies when the officers lack probable cause. *Id*. at 544.

The facts of *Flores* are similar to this case in the regard that the officers had no reason to suspect Flores of a crime other than the fact that he left a known stash house at the time the police anticipated a drug transaction to have occurred. McCoy, unknown to the police officers and agents

-7-

involved in this case, left a house shortly after police knew a drug transaction occurred within. As the court in *Flores* determined it unnecessary to undertake a probable cause analysis, this court finds that probable cause did not exist for the officers to arrest McCoy.

### B. Reasonable Suspicion

In the alternative, the Government argues that the officers did not need probable cause in order to stop McCoy. Officers may make an investigative stop of a vehicle where the stop is supported by reasonable suspicion of wrongdoing. *Flores*, 571 F.3d at 544 (citing *Terry*, 392 U.S. at 22); *see also United States v. Blair*, 524 F.3d 740, 749–50 (6th Cir. 2008). The court considers the totality of the circumstances to determine the validity of a *Terry* detention or stop. *Blair*, 524 F.3d at 750. As "an investigative stop is less intrusive than an arrest, the level of suspicion necessary for such a stop is 'considerably less than proof of wrongdoing by a preponderance of the evidence.'" *Id.* (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)). An investigatory stop permits an officer to "make[] reasonable inquiries" of a stopped person. *Terry*, 392 U.S. 30–31. The court in *United States v. Richardson*, 949 F.2d 851, 856 (6th Cir. 1991), stated that, "[t]he scope of activities during an investigatory stop must reasonably be related to the circumstances that initially justified the stop." The Supreme Court held that although "[a]n individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime," a location's characteristics are relevant for the determination of "whether the circumstances are sufficiently suspicious to warrant further investigation." *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000).

Whether or not the stop in this case was legal under *Terry* is a close call. The Court in *Flores* determined that stopping Flores was a reasonable investigatory stop because he left a stash

house at the time that law enforcement officers believe a drug transaction took place. *Flores*, 571 F.3d at 545. Similarly, McCoy left Buchanan's residence shortly after a drug transaction. However, even assuming officers could stop McCoy pursuant to *Terry v. Ohio*, the police did not have authority to arrest and search him.

A further search after an investigatory stop is not permitted unless officers have reason to believe the person is armed and dangerous, the person consents to a search, or the police learn information during the investigatory stop that gives them probable cause to arrest and search. *See, e.g.*, *Blair*, 524 F.3d at 752–53. Unlike the defendant in *Flores*, who consented to a search following a stop, *Flores*, 571 F.3d at 543, McCoy did not consent to a search in this case. Also, Porrini provided no testimony that the officers gained information during the stop that gave them probable cause to arrest McCoy.

Pursuant to *Terry v. Ohio*, 392 U.S. 1, 27 (1968), officers may conduct a "reasonable search for weapons for the protection of the police officer" when they have reason to believe that they are "dealing with an armed and dangerous individual." This Sixth Circuit has explained that "[t]hese preventive measures include the *Terry* frisk and a search of the passenger compartment" of an automobile. *United States v. Wright*, 220 Fed. App'x 417, 420 (6th Cir. 2007) (citation omitted). The court in *United States v. Campbell*, 549 F.3d 364, 372 (6th Cir.2008) (quoting *Bennett v. City of Eastpointe*, 410 F.3d 810, 822 (6th Cir.2005)), stated "[a] concern for officer safety permits a variety of police responses in differing circumstances, including ordering a driver and passenger out of a car during a traffic stop . . . and conducting pat-down searches upon reasonable suspicion that they may be armed and dangerous." An officer must "point to particular facts from which he reasonably inferred that the individual was armed and dangerous" in order to be permitted to pat a person down.

*Sibron v. New York*, 392 U.S. 40, 64 (1968) (holding search for drugs, not weapons, required probable cause, not merely a reasonable suspicion). Porrini never testified that he or any of the other officers believed that McCoy was armed or dangerous. Nor did he testify that there was a *Terry* frisk of the passenger compartment. Rather, his testimony was that McCoy was detained.

Despite the fact that no facts on the record support a suspicion that McCoy was armed, the Government relies on *United States v. Hardnett*, 804 F.2d 353, 355–56 (6th Cir. 1986) to argue that the officers were permitted to conduct a *Terry* stop. In that case, police officers had "information . . . sufficient to give the police a reasonable suspicion that the occupants of the car they observed had guns in their possession." *Id.* at 356. *Hardnett* is easily distinguishable from the present case, as the officers in *Hardnett* had a tip from an informant that four men in a particular car were carrying weapons, and the officers therefore had reason to suspect that the men were armed and dangerous. In this case, there was no reason for the police to believe that McCoy posed a security threat.

Therefore, the Government's reliance on *Terry* is unsuccessful. Even if stopping McCoy's car constituted a lawful investigatory stop, the officers still did not have a legitimate reason to go beyond a frisk or pat-down search of the passenger compartment by arresting and searching McCoy and the car. Porrini did not even testify that officers engaged in questioning or further investigation before arresting McCoy. It is clear that the officers acted on an order to arrest McCoy as a person who had just left the Buchanan residence.

### C. Good Faith Exception

The Government argues that even if the Detectives lacked probable cause to initiate the traffic stop, suppression of the seized evidence is not an appropriate remedy. The suppression of evidence "is not an automatic consequence of a Fourth Amendment violation." *Herring v. United*

*States*, 555 U.S. 135, 137 (2009). The Court explained that, "the exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence." *Id.* at 144. That case, however, addressed a situation where the police officers acted pursuant to a warrant that turned out to be invalid. In that situation, the Court determined that the evidence should not have been excluded because the benefits of deterrence did not outweigh the costs. *Id.* at 141.

The court is not inclined to apply the good-faith exception here. Porrini issued a general order requiring police officers to stop all people who left Buchanan's residence–*regardless* of individualized suspicion. This is precisely the type of deliberate decision exclusion of evidence is designed to deter. As the Supreme Court stated, "[t]o trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it." *Herring*, 555 U.S. at 144. This general order was also in stark contrast to careful monitoring and surveillance of Buchanan, to which Porrini also testified. Indeed, several transactions between Buchanan and the CHS had taken place before an arrest was made. The court finds the good faith exception to be inapplicable in this case and therefore finds that all evidence arising from the illegal arrest must be suppressed.

### III. CONCLUSION

For the foregoing reasons, the court hereby grant Defendant McCoy's Motion to Suppress (ECF No. 16). The cash found on him is hereby excluded. McCoy also asks for the following to be

excluded: "[a]ll other evidence and/or statements obtained either directly or indirectly as a result of the violation of Defendant's Constitutional Rights." (Mot. to Suppress 1, ECF No. 16.) Any statements or evidence arising from the illegal arrest must also be suppressed.

    IT IS SO ORDERED.

                                          /S/ SOLOMON OLIVER, JR.
                                          CHIEF JUDGE
                                          UNITED STATES DISTRICT COURT

September 20, 2011